

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| MARCELLA RICHMAN, individually and as Special Administrator of the Estate of Jack B. Richman, deceased, | ) ) ) ) |
| Plaintiff, | ) No. 98 C 7350 |
| vs. | ) Judge Joan Gottschall |
| MICHAEL SHEAHAN, in his official capacity as Sheriff of Cook County, *et al.*, | ) Magistrate Judge Jeffrey Cole |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

### I.
### INTRODUCTION

Judge Posner has lamented that all too often, experts are "'the mere paid advocates or partisans of those who employ and pay them, as much so as the attorneys who conduct the suit. There is hardly anything, not palpably absurd on its face that cannot now be proved by some so-called experts.'" *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 382 (7th Cir. 1986).[1] Thus, courts are not allowed to "take...on faith" whatever a paid expert claims, *Minasian,* 109 F.3d at 1216, even if the expert possesses truly distinguished credentials. *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316,

---

[1] *See also Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997)(the expert's affidavit "exemplifies everything that is bad about expert witnesses in litigation."); *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago,* 877 F.2d 1333, 1340 (7th Cir. 1989) (the expert "cast aside his scholar's mantel and became a shill for Mid-State. Judge Hart, by observing that the emperor has no clothes, protected the interests of the judicial system"); *Karn v. Ingersoll-Rand,* 168 F.R.D. 633, 639 (N.D.Ind. 1996); Huber, Galileo's Revenge, Junk Science in the Courtroom, 206-09 (1991); Wright and Gold, Federal Practice and Procedure, §6262 at 183 (1997).

319 (7th Cir. 1996). Rather, the Supreme Court has made clear that federal trial judges have an independent obligation to ensure that expert testimony is sufficiently reliable that it may be presented to the trier of fact. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

In light of the ubiquity of experts in modern federal litigation, *cf. United States v. Brown*, 32 F.3d 236, 239 (7th Cir. 1994); *In re Aircrash Disaster at New Orleans, La.*, 795 F.2d 1230, 1234 (5th Cir. 1986),[2] and the gatekeeping function *Daubert* has imposed on trial judges, there is scarcely a case in which pretrial challenges to the admissibility of expert testimony are not raised. This case is no exception. The plaintiff has moved to strike the expert reports of the defendants' three expert witnesses and to bar their testimony at trial.

## II.
## FACTUAL BACKGROUND

The plaintiff brings the underlying civil rights claim under 42 U.S.C. § 1983 on behalf of her son, Jack Richman, whom she alleges died shortly after fourteen sheriff's deputies restrained him during an altercation at his mother's appearance before an Illinois judge on a traffic violation. Following an exchange of words between the Richmans and the judge, the judge found Mr. Richman in contempt of court. As matters escalated, the judge ordered Mr. Richman removed from the courtroom. Mr. Richman weighed four-hundred-eighty-nine pounds. Plaintiff claims that the defendant sheriff's deputies responding to the situation used excessive force and that the defendant Sheriff of Cook County failed to properly train and supervise the deputies. *See Richman v. Sheahan*, 270 F.3d 430, 433-34 (7th Cir. 2001).

---

[2] In a study of trials in the California Superior Court in the late 1980s, experts appeared in 86% of the trials, and on average, there were 3.3 experts per trial. *See* J. Strong, McCormick on Evidence, § 13 (5th ed. 1999).

2

In their Fed.R.Civ.P. 26(a)(2) disclosure, the defendants have named three experts whom they intend to have testify about the use of force in law enforcement situations: John W. Bowman, Robert T. Johnson, and James F. Marsh.[3] The plaintiff has moved to strike the reports and to bar the testimony of all three for failure to have included a complete statement of the experts' opinions, as required by Rule 26(a)(2)(B), Federal Rules of Civil Procedure. The reports of Messrs. Johnson and Marsh, the plaintiff submits, rely too heavily on an uncritical acceptance of the deputy sheriffs' deposition testimony, while Mr. Bowman's report is simply too conclusory. The plaintiff further complains that in all three reports the experts improperly drew legal conclusions and made credibility determinations. Finally, the plaintiff submits that all three experts ventured beyond their area of expertise and commented upon the medical evidence regarding Mr. Richman's condition and the cause of his death. Review of the expert's reports demonstrates that they comply substantially with Rule 26(a)(2)(B). There are, however, portions of the reports dealing with medical evidence, witness credibility and legal conclusions that must be stricken and the experts precluded from testifying about them.

### III.
### THE ANALYTICAL FRAMEWORK FOR DETERMINING
### THE ADMISSIBILITY OF EXPERT TESTIMONY

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court

---

[3] Plaintiff off-handedly objects to the cumulative nature of the experts' testimony. (*Motion to Strike*, at 3). This concern is addressed by Local Rule 16.1, which allow only one expert witness for each party to testify on each subject. *See* Local Rule 16.1, Standing Order Establishing Pretrial Procedure, Final Pretrial Order, § 2(e) n.7; *Erickson v. Baxter Healthcare, Inc.*, 131 F.Supp.2d 995, 998 (N.D.Ill. 2001). A party may identify more than one expert on a subject under Rule 26(a)(2) and reserve for later its choice as to which expert to use at trial. *Commonwealth Ins. Co. v. Stone Container Corp.*, No. 99 C 8471, 2001 WL 385559, at *6 (N.D.Ill. Mar. 12, 2002). *Compare* Rule 403, Federal Rules of Evidence ("needlessly cumulative" evidence may be excluded).

3

held that the "general acceptance" test for the admissibility of scientific evidence, which had existed in the federal courts since 1923, was at odds with the liberal thrust of the Federal Rules of Evidence and their general approach of relaxing the traditional barriers to opinion testimony. *Id.* at 588-89, 593. The Court held that the displacement of the "general acceptance" test by the Rules did not mean that the Rules placed no limits on the admissibility of purportedly scientific evidence. Nor was the judge disabled from "screening" such evidence. Quite the contrary. Under the Rules, trial judges have a responsibility to make a determination as a precondition to admissibility, that proffered scientific evidence rests on a reliable foundation and is relevant to the task at hand. *Id.* at 589, 597. The insistence on reliability helps to ensure the integrity of the judicial process, *Mid-state Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989), and is of such transcendent importance that judges can act *sua sponte* to prohibit testimony that does not pass muster under *Daubert*. *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1094 (7th Cir. 1994).

The primary locus of the obligation to ensure reliability, the Court in *Daubert* held, was Rule 702, which at the time provided:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

While discussing several factors which "bear upon the [reliability] inquiry,"[4] the Court emphasized that the

---

[4] They were: (1) whether a theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation. Although rejecting "general acceptance" as the exclusive test for admissibility, the Court noted that it could be an additional factor that might bear on reliability. 509 U.S. at 593-94.

4

inquiry is "a flexible one," and that it was "not presum[ing] to set out a definitive checklist or test." The focus is not on the expert's conclusions, but on the underlying methodology. *Id.* at 593-595. To be admissible, scientific evidence must supported by "appropriate validation." *Id.* at 590.

   *Daubert* concluded with a reaffirmation of the adversary system – "which is fundamental to Anglo-American jurisprudence," *United States v. O'Neill*, _F.3d_ (7th Cir., slip.op. 04-2589 at 12, Feb. 10, 2006)(2006 WL 306928) – and the capability of juries to understand scientific evidence and weigh the credibility of the competing experts, notwithstanding their contradictory conclusions and "dogmatic assertions." *Railroad Commission of Texas v. Rowan & Nichols Oil Co.*, 310 U.S. 573, 583 (1940). Vigorous cross examination, presentation of contrary evidence and careful jury instructions, the Court said, are the traditional and appropriate means of attacking shaky but admissible evidence. *Daubert*, 509 U.S. at 596. *Accord Walker v. Soo Line R. Co.*, 208 F.3d 581, 587 (7th Cir.2000); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718-719 (7th Cir. 2000); *Spearman Industries, Inc. v. St. Paul Fire & Marine Insurance Co.*, 128 F.Supp.2d 1148, 1150 (N.D.Ill. 2001)("The rejection of expert testimony is the exception rather than the rule, and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'").[5]

   The flexibility of the inquiry envisioned by Rule 702, the illustrative nature of the *Daubert* factors, and the considerable leeway a trial judge must have in deciding whether expert testimony is reliable, were dominant themes of *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999). The Court held that the

---

   [5] Whatever one's views about Dean Wigmore's characterization of cross-examination as "beyond any doubt, the greatest legal engine ever invented for the discovery of truth," 5 J. Wigmore, Evidence, §1367 (Chadbourn Rev. 1974), since at least the time of Blackstone, it has been felt that the goal of evidentiary reliability can best be assured by testing the evidence in the "crucible of cross examination." *Crawford v. Washington*, 541 U.S. 36, 61-62 (2004).

5

basic gatekeeping obligation created in *Daubert* applies equally to testimony based on technical and other specialized knowledge, *id.* at 141, 147-49, and it recognized that there are many different kinds of experts and many different kinds of expertise. *Id.* at 150.

Since the gatekeeping inquiry must be tied to the facts of the particular case, 526 U.S. at 150, the Court held that a trial court may – but is not required to – consider "one or more of the more specific factors that *Daubert* mentioned when doing so will help determine the testimony's reliability." But, the Court stressed, those factors, which were meant "to be helpful, not definitive," "'neither necessarily nor exclusively apply to all experts or in every case." *Id.* at 142. Their applicability will depend on "'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" The procedure employed will depend largely on the "particular circumstances of the particular case at issue." *Id.* at 150, 152. *Accord Smith*, 215 F.3d at 719 ("The Rule 702 test is a flexible one, and no single factor is either required in the analysis or dispositive as to its outcome.").

Rule 702, as amended, now provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

To gauge reliability, it must first be determined whether the expert is qualified in the relevant field, and whether the reasoning or methodology is valid. *Daubert*, 509 U.S. at 592-93; *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005). The expert must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire*, 526 U.S. at 152. And

of course, the expert's testimony must be relevant to the task at hand. *Daubert*, 509 U.S. at 591, 59. Just as proof of negligence in the air will not do, *Palsgraf v. Long Island RR*, 248 N.Y. 339, 344 (1928) (Cardozo, C.J.), neither will proof of expertise in the abstract. A snappy resume does not ensure admissibility.

## IV.
## THE EXPERTS' REPORTS

### A.
### Mr. Bowman's Report

Mr. Bowman submitted a three-page report, which begins with a brief recitation of his qualifications as an expert on the use of force in law enforcement situations – qualifications which the plaintiff does not challenge. The report is supplemented by Mr. Bowman's lengthy *curriculum vitae*. He is Professor Emeritus at the University of Illinois' Police Training Institute and has authored numerous manuals and articles on police strategy, training, and tactics. He lists nearly forty cases in which he has been involved as an expert witness over the last ten years.

Mr. Bowman reached his conclusions after reviewing a variety of materials, including but not limited to: the Cook County Sheriffs Police Internal Affairs Report and Attachments, the reports of Drs. Bryant and Fusaro,[6] the deposition transcripts of more than two dozen witnesses, rules of conduct applicable to deputy sheriffs and courtroom deputies, Police Training Institute materials, applicable Illinois Criminal Law and Procedures, and a videotape of Mr. Richman at an unrelated hearing. After considering these materials, Mr. Bowman reached the following conclusions:

---

[6] Dr. Aldo Fusaro, of the Cook County Medical Examiner's Office, performed the autopsy on Mr. Richman. Dr. Bryant performed a second *post mortem* examination, but it is unclear in what capacity.

1. The Deputy Sheriffs involved in arresting and controlling Mr. Richman were carrying out there [sic] lawful duties and used only that force that was reasonable and necessary.

> A. Judge Jordan found Mr. Richman in contempt and ordered him removed from the courtroom.

> B. After Deputy Kim requested that Mr. Richman accompany him from the courtroom, Mr. Richman became uncooperative and actively resisted efforts to arrest and control him.

> C. Deputies used only that force necessary to restrain an actively resisting subject.

2. The Deputies involved in arresting and controlling Mr. Richman acted in manner that reflected proper training and supervision.

> A. Deputy Kim immediately requested assistance so as not to subject himself or Mr. Richman to unnecessary risk.

> B. Deputies took physical control of Mr. Richman approaching from both sides attempting to control his extremities while attempting to get him handcuffed. As the resistance level continued Mr. Richman was taken to the ground and placed on his stomach following standard procedures as taught by the Cook County Sheriffs Academy, other academies in the State of Illinois, and academies throughout the country.

> C. Deputies recognized the need to string cuff sets together and did so demonstrating knowledge of a common procedure for cuffing large individuals taught by the Cook County Sheriffs Academy, other academies in the State of Illinois, and academies throughout the country.

> D. Upon recognizing signs of distress on the part of Mr. Richman, officers immediately uncuffed him and began life saving procedures.

> E. Deputies acted in a manner that reflected knowledge of General Orders and training bulletins.

> F. Supervisors on the scene took charge assisting where necessary and ensuring the safety of others present.

> G. Once Mr. Richman was removed to the hospital supervisors and

> command staff insured that a proper investigation was initiated by instructing all involved not to discuss the matter but to complete reports immediately.
>
> H. A complete Internal Affairs Investigation was completed following policies and procedures similar to those used by all police agencies throughout Illinois and the country.

(*Motion to Strike*, Ex. 2, at 2-3).

## B.
## Mr. Johnson's Report

Mr. Johnson provided a ten-page report, which is also supplemented by his background and professional experience. He is the Inspector/Director of Police for AMTRAK's western region and works as a private consultant on law enforcement policy and practices. Before that, he had a distinguished career with the Illinois State Police. In preparing his report, Mr. Johnson reviewed the deposition transcripts of thirty-two witnesses; the reports of Drs. Fusaro and Bryant; various law enforcement training materials and guidelines; Illinois statutes on peace officers' use of force; and other related materials. The plaintiffs do not challenge Mr. Johnson's qualifications.

In his report, Mr. Johnson outlined the policies on the use of force from the International Association of Chiefs of Police, the Illinois Training and Standards Board, and the Cook County Sheriff's training materials. He then synthesized the deposition testimony of the many witnesses, arriving at an account of the events that followed fairly closely the defendants' versions of the events that unfolded in the courtroom that day. Beyond that, however, Mr. Johnson summarized the medical examiner's testimony, and discussed the weight of the evidence, opining that while the testimony of one witness indicated "that the deputies used more force and were more aggressive than the testimony of the other witnesses...

9

[t]here is overwhelming contrary testimony and evidence by other witnesses and examination." (*Motion to Strike*, Ex. 3, at 8).

Based on his review of the relevant materials, Mr. Johnson determined that:

1. The officers' use of force was reasonable and in accordance with accepted practices and standards within the field of law enforcement (See IACP MODEL POLICY -USE OF FORCE and THE ILLINOIS LAW ENFORCEMENT TRAINING AND STANDARDS BOARD - GUIDELINES FOR USE OF FORCE).

2. The officers' use of force was within the elements established by Illinois Statute governing the use of force (720 ILCS) - Section 5/7-5 PEACE OFFICER'S USE OF FORCE IN MAKING ARREST.

3. The officers' actions and use of force was within the guidelines established by the Cook County Sheriffs Office Policy and training which mirrors Illinois law.

4. The officers had the legal authority and legal duty and obligation to take Jack Richman into custody.

5. The officers' contact with and removal of Marcella Richman from the courtroom was lawful and appropriate under the circumstances.

6. The training provided to the Sheriff's deputies was adequate and exceeded standards.

7. The supervision provided to the deputies was appropriate.

8. The proximate cause of the Plaintiff's death was his unlawful refusal and resistance to follow the judge's and officers' lawful orders, coupled with his poor health.

(*Motion to Strike*, Ex. 3, at 3).

## C.
## Mr. Marsh's Report

Mr. Marsh's report covers nine pages, and, like the reports of Messrs. Johnson and Bowman, it is supplemented with his *curriculum vitae*. He is a twenty-five-year veteran of the Chicago Police Department, and has been an instructor and has supervised instructors at the Chicago Police Academy in

the areas of defensive tactics and control techniques. He has also lectured and authored articles on these subjects. In the last five years, Mr. Marsh has served as an expert witness in sixteen cases. As with the two other experts, the plaintiff does not suggest Mr. Marsh is unqualified.

To arrive at his opinion, Mr. Marsh reviewed the transcript of Irene Libman's deposition testimony,[7] the videotape of Mr. Richman at an unrelated hearing, several manuals and guides on the use of force in law enforcement and courtroom security situations, several Cook County Sheriff's Department training bulletins and general orders, the Cook County Sheriffs Police Internal Affairs Division report, the reports of Drs. Bryant and Fusaro, and other pertinent materials. He provides a summary of the events that occurred in the courtroom that day, apparently drawn from the Internal Affairs Division investigation report.

Mr. Marsh explained that "[t]he appropriateness of force used upon a person is that amount of force the law allows, which is an accepted national standard . . . .established by the U.S. Supreme Court which is that of 'objective reasonableness' as set forth in *Graham v. Connor*, 490 U.S. 386 (1989)." (*Motion to Strike*, Ex. 4, at 4). Mr. Marsh also cites several "relevant non-legal standards" that he relied upon, as expressed in manuals, training bulletins, and articles. Based on the materials he reviewed, Mr. Marsh begins with a "General opinion" that:

> A law enforcement officer may use that amount of force upon a person that the law allows. In order for an officer's use of force upon a person to be acceptable, the application of force must:
>
> 1. Be acceptable under the United State Constitution and Statutory law.

---

[7] According to the plaintiff, Ms. Libman was a court clerk who witnessed the events at issue. All three experts generally chose to discount her testimony. (*Motion to Strike*, at 10 n.3).

2. Be acceptable under the applicable state constitution and statutory law.

3. Be acceptable under applicable department policies, procedures, and training.

\*   \*   \*

Officers are taught that reasonable force options must be based on factors such as: (1) the severity of the crime at issue, (2) immediacy of the threat, (3) whether the subject is actively resisting arrest or attempting to flee, (4) the fact that officers are forced to make split second decisions in circumstances that are tense, uncertain, and rapidly changing, and that they should not be judged with 20/20 hindsight. Prudent and well-trained officers are taught that they are allowed to use only objectively reasonable force. Reasonable force means there must be a lawful function to perform therefore, a legitimate need to establish and/or maintain control over an unwilling subject or to protect self or others from an attack. However, the cost to the subject in terms of injury may not outweigh the law enforcement's legitimate need to control the offender's illegal actions.

(*Motion to Strike*, Ex. 4, at 5-6).

Mr. Marsh then moved from the general to the specific and gave his assessment of the conduct of

the Sheriff's deputies during the events at issue:

It is my professional opinion to a reasonable degree of certainty in the police profession that it is more probable than not that there was an immediate and legitimate need to gain physical control of the parties involved, and stabilize this situation in a timely manner to prevent escalation and a need to use a more intense force option.

The need for force by the deputies was: *to restore order, maintain security in the courtroom, protect Jordan, protect spectators and obey the Judge's immediate arrest order,* as per department policy and training. This lawful police function and the force options employed must be viewed in light of the probability of causing tissue damage or significant injury to [Mr.] Richman.

\*   \*   \*

The deputies were not compelled to use the minimum or a lesser level of force, just force that was "objectively reasonable" under the circumstances. Any reasonable, prudent and well-trained officer would have known that the use of force in question was justified under the totality of the circumstances which amounted to: holding, pulling, employing downward pressure and handcuffing a resistive, combative and unruly arrestee within a reasonable time period, was not disproportionate to the threat posed and had a low risk potential for

12

injury to [Mr.] Richman.

(*Motion to Strike*, Ex. 4, at 6-7)(Emphasis in original). Mr. Marsh opined that the force used was that of prudent and well-trained police officers and in compliance with the standards requiring that use of force must be acceptable under the United States Constitution and statutory law, under the applicable state constitution and statutory law, and under applicable department polices, procedures, and training. Furthermore, he submitted that the sheriff's deputies followed proper arrest and control procedures for taking a resistive and/or combative person into custodial arrest and listed those procedures in the order they ought to be applied. In fact, according to Mr. Marsh, the sheriff's deputies used less force than what would have been considered appropriate under a use of force continuum for a resistive and/or assaultive arrestee. (*Motion to Strike*, Ex. 4, at 8).

Finally, Mr. Marsh rejected several conflicting witness statements that suggested Mr. Richman's behavior was non-resistive and that the officers used excessive force in restraining him, finding that the physical evidence, official investigative reports, majority of witness statements, and autopsy findings undermined those accounts. He went on to discuss the medical evidence. He noted that that evidence suggested that "even at rest, [Mr.] Richman was close to the threshold where the demand exceeds the blood flow, which disputes . . . differing observations by several witnesses." Mr. Marsh also pointed to "unforeseen risk factors" such as Mr. Richman's obesity, cardiovascular condition, and "sudden . . . onset of adrenalin" that a prudent and well-trained police officer could not have calculated. (*Motion to Strike*, Ex. 4, at 8). According to Mr. Marsh, "the overwhelming evidence does not support that [Mr.] Richman was the victim of police misconduct or excessive force." (*Motion to Strike*, Ex. 4, at 8).

13

# V.
## ANALYSIS

### A.
### The Expert Reports Adequately Comply With Rule 26(a)(2)(B)

The plaintiff first argues that the expert reports do not comply "facially" with Rule 26(a)(2)(B).

(*Motion to Strike*, at 6-7). The Rule, which governs the format of reports disclosing expert testimony,

requires that the disclosure of a witness retained to provide expert testimony must:

> be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

*See Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004). The report must be "'detailed and

complete.'" *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n. 6 (7th

Cir.1998)(quoting Advisory Committee's note).

As discussed in the summaries of the three reports, the experts all clearly provided complete

statements – albeit in varying degrees of detail – of their opinions regarding Mr. Richman's encounter with

the deputies. They also set forth the information they considered: they indicated that they assessed the

conduct of the sheriff's deputies in light of their understanding of the events as they unfolded – drawn from

the evidence – and their experience and expertise in the use of force in law enforcement. In addition, each

expert listed the evidence, exhibits, and supporting materials upon which he relied. And each described

his qualifications, experience, and fee schedule. Despite plaintiff's assertion to the contrary, it cannot be

14

said that any of the reports are "facially non-compliant" with Rule 26(a)(2)(B).

But plaintiff demands more information. Citing *S.E.C. v. Lipson*, 46 F.Supp.2d 758 (N.D.Ill. 1999), plaintiff submits that "[o]ne *crucial* purpose" of the expert disclosure rule is to allow the opposing party to dispense with the expert's deposition. (*Motion to Strike*, at 6)(Emphasis supplied). Not exactly. The court in *Lipson* merely indicated that it was "[o]ne of the purposes." 46 F.Supp.2d at 763 n.3. There are others, no less significant, such as the minimization of the expense of deposing experts, the shortening of direct examination, and the prevention of ambush at trial. *Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 35 (1st Cir. 2001)(and cases cited). Indeed, the Advisory Committee Notes, which are informative, *Williamson v. United States*, 512 U.S. 594, 614-615 (1994) (Kennedy, J., concurring), explain the Rule's design this way:

> The information disclosed under the former rule in answering interrogatories about the "substance" of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness.
>
>                     \*      \*      \*
>
> Revised subdivision (b)(4)(A) authorizes the deposition of expert witnesses. Since depositions of experts required to prepare a written report may be taken only after the report has been served, the length of the deposition of such experts should be reduced, and in many cases the report may eliminate the need for a deposition.

Rule 26(a)(2)(B)(Advisory Committee Note to 1993 amendment). In sum, the intent of the amendment was not to eliminate depositions of expert witnesses, as plaintiff claims, but rather to allow informed depositions in those cases – and they predominate – in which depositions occurred.

More importantly, plaintiff's conduct belies any claim that the depositions were adversely affected

by the purportedly sketchy nature of the reports.[8] Although the three reports were submitted on April 15, 2005, plaintiff never challenged them until four months later, on August 16, 2005, which was a month after the close of expert discovery on July 20th. "It is inconceivable that the plaintiff [ ] would have taken the depositions of [the experts or failed to do so]. . . if [she] truly felt [she was] being or would be 'severely prejudiced' by" the reports now claimed to be deficient. *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331, 340 (N.D.Ill. 2005). In short, there is nothing to suggest that the reports had even the slightest effect on plaintiff's discovery efforts. Consequently, this is not an occasion for an exercise of discretion to strike the expert reports for the failure to comply with the requirements of Rule 26(a)(2)(B). *See Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000) (7th Cir.1998)(no indication opposing party had been harmed).

In any event, by waiting until after the close of discovery, the plaintiff has waived any conceivable claim that the reports adversely affected their ability to depose the experts – and that is the core of their

---

[8] Plaintiff specifically targets Mr. Bowman's report as "conclusory" or "sketchy" and supplying "nothing but a bottom line." (*Motion to Strike*, at 7). The reports adequately explain the reasons for their ultimate conclusions, and, brevity alone does not result in automatic invalidation of a report. *See Abdullahi v. City of Madison*, 423 F.3d 763, 771-72 (7th Cir. 2005). An expert report need not be a "primer on why the facts allow the expert to reach [his] conclusion," but must be "sufficient to establish the reasoning underlying the conclusion." *Vollmert v. Wisconsin Dept. of Transp.*, 197 F.3d 293, 300-301 (7th Cir. 1999). The reports in this case do precisely that. Mr. Bowman's report cites the testimony upon which he relies, lists the relevant authoritative materials he reviewed on the subject of use of force, takes the reader through each step of the escalation of force that occurred in the incident, and offers his assessment of the sheriff's deputies' performance. That is far more substantive than in cases where courts have criticized reports as containing "nothing but a bottom line." *See Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 418-19 (7th Cir. 2005)(when asked what methods he used to generate his conclusions, expert "repeatedly answered 'my expertise'. . . which is to say that he either had no method or could not describe one."); *Zeigler Coal Co. v. Director, O.W.C.P.*, 312 F.3d 332, 336 (7th Cir. 2002)(cancer expert did not discuss the normal variability in the time it takes colon cancer to kill its victims, did not point to epidemiologic studies, did not cite a single article in the medical literature); *United States v. Roach*, 296 F.3d 565, 572 (7th Cir. 2002)("the analytic leap from a shopping compulsion to a significantly impaired ability to control fraudulent conduct spanning three years is too great to make without supporting reasons or evidence").

gripe about the reports. *Cf. In re Sulfuric Acid Antitrust Litigation*, 230 F.R.D. 527, 533 (N.D.Ill. 2005); *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. at 339-340.

## B.
## The Substance of the Proffered Expert Testimony

The plaintiff has essentially conceded that, except in one respect, the defense experts possess the specialized knowledge necessary for them to testify, [9] and that in excessive force cases, expert testimony is routinely allowed. *See, e.g., Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005); *Calusinski v. Kruger*, 24 F.3d 931, 937 (7th Cir. 1994); *Kladis v. Brezek*, 823 F.2d 1014, 1019 (7th Cir. 1987). The plaintiff's objection relates to the substance of the anticipated testimony, which, she contends, consists of legal conclusions and credibility determinations.

## 1.
## The Experts May Not Offer Testimony Based On Medical Evidence Or Opinion

The most obvious flaws in the expert reports are the forays of Mr. Johnson and Mr. Marsh into the area of medical evidence. As Judge Shadur remarked in a similar context, "this Court's review of [the expert's] CV[s] notes no [M.D.] degree among [their] credentials . . . ." *Gentieu v. Tony Stone Images/Chicago, Inc.*, 214 F.Supp.2d 849, 852 (N.D.Ill. 2002). Neither gentleman is a physician, and thus, neither is qualified to offer medical opinions or comment on medical evidence. *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 816 (7th Cir. 2004)(expert must be qualified in the relevant field).

Mr. Johnson not only discusses and evaluates the medical evidence, (*Motion to Strike*, Ex. 3, at

---

[9] That concession is prudent since "experience. . . of all teachers the most dependable," *Funk v. United States*, 290 U.S. 371, 381(1933), is the predominant, if not the sole basis, for a great deal of reliable expert testimony. *See Kumho Tire*, 526 U.S. at 150; *United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001).

17

7-8), but offers his opinion that the proximate cause of the Plaintiff's death was in part due to his "poor health." (*Motion to Strike*, Ex. 3, at 3). This is not an opinion about the degree of force used by the officers – matters about which Mr. Johnson and Mr. Marsh are competent – but is rather, an opinion far outside the realm of their expertise, as the defendants concede. (*Defendants' Response to Plaintiff's Motion to Strike*, at 11). These portions of Mr. Johnson's report must be stricken and, of course, Mr. Johnson will not be permitted to testify as to such matters at trial.

Furthermore, this testimony cannot be admitted under Rule 703, Federal Rules of Evidence, since there has been no showing that the medical reports are the kind of evidence upon which experts in the field of excessive force rely. Moreover, even "[a] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)(Posner, J.). *See also Loeffel Steel Products v. Delta Brands*, 387 F.Supp.2d 794, 809, 824 (N.D.Ill. 2005).[10]

Mr. Marsh's report and proffered testimony are similarly flawed. He also cites Mr. Richman's obesity, cardiovascular condition, and onset of adrenalin as factors leading to his death. This opinion is clearly beyond his ken as an expert on the use of force in law enforcement, and defendants do not argue otherwise. These portions of his report must also be stricken and, like Mr. Johnson, he will not be allowed to offer such testimony at trial.

---

[10] Rule 703 provides, in pertinent part, that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted."

## Experts Cannot Make Credibility Determinations But May Base Their Opinions On A Version Of The Events Which Is Assumed To Be True If It Is Supported By Evidence

Perhaps the most vigorously advanced criticism of the experts' reports is that they made impermissible credibility determinations about the testimony of the eyewitnesses to and participants in the fateful encounter with Mr. Richman, as well as those involved in the events that followed. Both Mr. Marsh and Mr. Johnson specifically commented on the credibility of the witnesses (*Motion to Strike*, Ex. 3, at 8; Ex. 4, at 8),[11] and all three experts based their opinions on a general acceptance of the defendants' version of the events. Thus, the plaintiff maintains, all three experts must be precluded from testifying at all. The argument is unpersuasive.

A fundamental premise of our system of trial in both civil and criminal cases is that determining the weight and credibility of witness testimony is for the jury, who are presumed to be fitted for the task by their natural intelligence and their practical knowledge of the affairs of life. *United States v. Scheffer*, 523 U.S. 303, 313 (1998). It is this premise that underlies the principle that a witness's credibility is "not an appropriate subject matter for expert testimony." *United States v. Welch*, 368 F.3d 970, 975 (7th Cir. 2004); 3 Weinstein's Federal Evidence ¶704 [02] at 704-15 (1996). Thus, Mr. Marsh cannot be allowed to testify that "the physical evidence, official investigative reports, majority of witness statements, and autopsies" undermine the "conflicting witness statements" that implied that Mr. Richman was the victim of excessive force. Nor can he be allowed to testify that "the overwhelming evidence does not support that

---

[11] Mr. Marsh does not merely discuss the medical evidence, but employs it in his evaluation of witness testimony and uses it as a basis to conclude that that testimony is not credible. For example, he concludes that certain witness statements suggesting the Mr. Richman was non-resistive are belied by the autopsy reports of Drs. Fusaro and Bryant. (*Motion to Strike* , Ex. 4, at 8).

[Mr.] Richman was the victim of police misconduct or excessive force."

Just as clearly, Mr. Johnson cannot be allowed to testify that "Irene Libman's testimony . . . that the deputies used more force and were more aggressive" is undermined by "overwhelming contrary testimony and evidence by other witnesses . . . ." Such testimony is a direct and explicit commentary on the credibility of witnesses, and constitutes a usurpation of the jury's role. It does nothing more than instruct the jury on how they ought to evaluate witnesses' testimony. Those portions of their reports must be stricken.

The remaining question is whether the experts should be precluded from giving opinions on matters within their admitted competence merely because the opinions are based on a general acceptance of the defendants' version of the encounter with Mr. Richman. In almost all cases – and perhaps especially in excessive force cases, there will be a conflict in the testimony of the witnesses. It is precisely because experts are prohibited from resolving these conflicts – the very rule contended for by the plaintiff– that the expert's opinions necessarily must be based on someone's version of the incident.

Experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence. *See, e.g., TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993); *International Adhesive Coating Co. v. Bolton Emerson International*, 851 F.2d 540, 546 (1st Cir. 1988). That does not mean that the expert has made impermissible credibility determinations that preclude him from testifying. If an expert could not base his opinion on assumptions – which in turn are based on testimony – there could be little meaningful and informative expert testimony in any case in which there was a divergence of testimony. The question is not whether the opinion is based on assumptions, but whether there is some factual support for them. If there is not, they are by hypothesis unreliable and

20

inadmissible. *Cf., Buscaglia*, 25 F.3d at 533 (expert testimony inadmissable if based on *unsupported* assumptions). If there is, it is for the jury, properly instructed, to determine the credibility of the witnesses and thus the weight to be given to the expert opinion. [12]

There is a critical distinction between an expert testifying that a disputed fact actually occurred or that one witness is more credible than another and an expert giving an opinion based upon factual assumptions, the validity of which are for the jury to determine. The former is manifestly improper, the latter is not. As the court said in *Atkinson Warehousing and Distribution Inc., v. Ecolab Inc.,* 99 F.Supp.2d 665, 670 (D.Md. 2000): "Pursuant to Rule 704... an opinion based on a disputed fact may not be excluded simply because it pertains to an issue to be decided by the jury." *Cf., In re Air Disaster at Lockerbie, Scotland,* 37 F.3d 804, 825-826 (2d Cir. 1994)(experts permitted to give opinions based on summaries of portions of testimony adduced at trial and presented to them by the lawyer who employed them).

Rule 702 envisions factual disputes, as the Advisory Committee's Note to Rule 702 demonstrates:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

The Advisory Committee stressed that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system" or to allow the district court to preempt the jury by evaluating the correctness of the facts on which the expert relied. *See Micro Chemical, Inc. v. Lextron, Inc.,* 317 F.3d

---

[12] It is proper and desirable for the jury to be instructed that it is free to reject the testimony of any expert not supported by the evidence. *See* 3 Weinstein and Berger, Weinstein's Federal Evidence, ¶ 704 [01] at 704-8 n.23, and ¶ 704 [02], n14.

21

1387, 1392 (Fed.Cir. 2003); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir.2002). Yet,

exclusion of expert testimony on the ground that it relied on one version of events would have precisely that

effect.

It is not an answer to say that the underlying facts on which the experts base their opinion came

from arguably biased sources. All parties are biased. Credibility determinations, which encompass

questions of bias, are for the jury based upon their assessment of those parties, not for the court under its

gatekeeping function. *See United States v. Chang*, 207 F.3d 1169, 1173 (9th Cir. 2000)(Testimony

"otherwise admissible" under Rule 702 "is not precluded simply because of a relationship between a

witness and one of the parties"); *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir.

2000)("the accuracy and truthfulness of the [plaintiff's] underlying medical history is subject to meaningful

exploration on cross-examination and ultimately to jury evaluation"); *Soden v. Freightliner Corp.*, 714

F.2d 498, 503 (5th Cir. 1983)(statistics prepared for the litigation and supplied by sister company of one

of the parties did not preclude reliance by expert on them); *Loeffel Steel Products, Inc. v. Delta Brands,

Inc.*, 372 F.Supp.2d 1104, 1119 (N.D.Ill. 2005)(and cases cited)(information supplied by plaintiff's

employees).[13]

Rule 702 sought to liberalize the rules governing the admission of expert testimony. *See Daubert*,

at 588-89, 593; *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991); *Krist v. Eli Lilly &*

---

[13] Bias is never collateral, and the range of circumstances from which the law allows the jury to infer bias is as broad as human nature is diverse. *See United States v. Abel*, 469 U.S. 45 (1984); *United States v. Frankenthal*, 582 F.2d 1102, 1106 (7th Cir. 1978). Thus, nothing will prevent Ms. Richman from cross-examining the experts about the "biased" nature of the sources on which they purported to rely and the unsupportability of their opinions if the jury disbelieves the defendants version of events. Moreover she will be free to propound questions based on a contrary version of events. *Cf. Barefoot v. Estelle*, 463 U.S. 880, 905 n.10 (1983).

*Co.*, 897 F.2d 293, 298 (7th Cir. 1990) ("the rule on expert testimony is notably liberal"). Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility. *Miles v. General Motors Corp.*, 262 F.3d 720, 724 (8th Cir. 2001); 3 Weinstein's, Federal Evidence §702[02] at 702-30.

The cases relied on by Ms. Richman do not lead to a different result. In *United States v. Benson*, the expert indicated that he believed certain witnesses were credible and based his assessment on that credibility determination. He "simply told the jury whom to believe." 941 F.3d at 604. The distinction is between testifying about witness credibility and testifying as to an opinion based on one of two "competing versions of the facts," (Advisory Committee Notes to Rule 702). The expert in *Benson* could not do the former; the experts here may do the latter. The validity of the version upon which their opinions depend will be tested at trial through the traditional devices of the adversary system, as *Daubert* requires.

*Gregory v. Oliver*, No. 00-5984, 2002 WL 31972165 (N.D.Ill. Dec. 27, 2002) does not alter the analysis. There, the expert report was found to be flawed not because it selected and relied on one of two competing versions of events, but because it did not and could not in the first instance even consider the competing evidence because the defendants' lawyer "provided to [the expert] for review... everything on defendants' side of the case, but *nothing from Gregory's version of events.*" *Id.* at *3. (Emphasis in original). Consequently, the court concluded that the expert's testimony would not assist the trier of fact to understand the evidence or determine a fact in issue. This case differs from *Gregory* since all three experts here reviewed a wide variety of materials, including testimony sympathetic to the plaintiff. (*Motion to Strike*, at 10). That they chose between competing versions of the incident, as envisioned by Rule 702, does require that their testimony be barred. *Micro Chemical*, 317 F.3d at 1392; *Pipitone*, 288 F.3d at

23

**3.**

**Rule 704 Permits Experts To Give Opinions on Ultimate Issues Including The Defendants' Compliance With Or Departure From Applicable Professional Standards And The Reasonableness Of Their Behavior As Measured By Those Standards**

**a.**
**Rule 704 And Ultimate Issues**

Historically, witnesses were prohibited from testifying about the ultimate issues as a particular aspect of the rule against opinions. As Wigmore and others noted, the Rule was unduly restrictive, difficult to apply and generally served only to deprive the trier of fact of useful information. The basis usually assigned for the Rule, to prevent the witness from usurping the province of the jury, is, "aptly characterized as 'empty rhetoric.'" *United States v. Scheffer*, 523 U.S. 303, 318-19 (1998)(Kennedy, J., concurring). Rule 704(a) eliminated that prohibition by providing that the "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." [14]

Rule 704 does not define "ultimate issue," but it is generally thought that ultimate issues under the Rule must be factual and not legal. *Hygh v. Jacobs*, 961 F.2d 359, 364 (2nd Cir. 1992). [15] Although the

---

[14] Rule 704(a) does not make an opinion on an ultimate issue admissible. It simply provides that if it is "otherwise admissible," the fact that the opinion embraces an ultimate issue does not make it objectionable. Opinion testimony embracing an ultimate issue can be excluded if it is objectionable on grounds recognized by other provisions in the Federal Rules of Evidence. Rule 702, for example, requires that the opinion "assist the trier of fact," *United States v. Welch*, 368 F.3d 970, 974 (7th Cir.2004), and Rule 403 is an independent basis for exclusion. 29 Wright and Gold, §6283 at 374 (collecting cases).

[15] Rule 704 does not allow expert opinions containing "legal conclusions," not because they involve an ultimate issue, but because they do not assist the trier of fact, and thus are not "otherwise admissible." *West By and Through Norris v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997); *Giles v. Rhodes*, 2000 WL
(continued...)

principle is easily articulated, its application is often difficult, and the cases elude easy harmonization. This is hardly surprising in light of the extraordinary discretion the districts courts have in admitting and excluding expert evidence and the imprecision in attempts to draw a sound distinction between "fact" and "law." *United States v. Parris*, 243 F.3d 286, 288 (6th Cir.2001).

"The validity of this point is at the very heart of Rule 704(a). One of the reasons underlying the abolition of the ultimate-issue rule was to avoid the 'odd verbal circumlocutions' in which courts engaged when attempting to draw the distinction between legal conclusions and opinions as to 'ultimate facts.'" 29 Wright and Gold, §6284 at 380. Thus, the admissibility of opinion testimony that may involve legal conclusions ultimately rests – or should – not on labels, but "upon whether the testimony helps the jury resolve the fact issues in the case." *Id.* at 381.

The inquiry should focus on whether the opinion is phrased in terms that employ legal criteria that the jury does not understand based upon its own experiences in life. This is the problem of "inadequately explored legal criteria." *(See* Advisory Committee Note to Rule 704). The example chosen by the Advisory Committee's Note illustrates the point. The question of whether a testator had the "capacity" to make a will should be excluded, while the question whether the testator had sufficient mental capacity to known the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution would be allowed. While both questions employ the same legal term, the difference between them is a matter of the jury's ability to understand answers to the questions.

---

[15](...continued)

1425046 at *17 (S.D.N.Y. 2000); 29 Wright and Gold, §6282 at 368, 373. Even if a jury were not misled into adopting outright a legal conclusions proffered by an expert, the testimony would remain objectionable by communicating a legal standard. *Hygh*, 961 F.2d at 364.

"Capacity" has a particular meaning in the law of wills that is not intuitively obvious to a layperson. Thus, a simple answer to the first question leaves the jury with nothing to assist it, and they may even attribute to the answer a meaning the witness did not intend. In contrast, the second question adds a description that explains how the legal test for capacity and thus assists the trier of fact. *Hygh*, 961 F.2d at 363-364; 29 Wright and Gold, §6284 at 381-382. The line between a permissible and impermissible opinion under Rule 704 is sometimes difficult to draw – as the plaintiff concedes, there is a substantial "grey area" between "ultimate issues" and "legal conclusions" – and it is often semantic and artificial.

## b.
## Expert Opinion Regarding Professional Standards And Compliance With Them And The Reasonableness Of Conduct As Measured Against Those Standards

There is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the defendants' performance in light of those standards. For example, in *Calusinski* v. *Kruger*, the Seventh Circuit held that the expert witness was not only allowed to explain the proper procedures used by law enforcement officials to restrain arrestees who resist arrest, but to further opine that the defendants' actions were well within proper guidelines for use of force by the police. 24 F.3d at 937. In *Haley v. Gross*, the Seventh Circuit affirmed the district court's allowance of an expert in the area of corrections management to testify about legal standards and what he believed to be the proper response to certain prison situations. 86 F.3d at 645. [16]

---

[16] *See also, In re Air Disaster at Lockerbie Scotland*, 37 F.3d at 825-826(experts permitted to testify that training requirements had been violated); *Heflin v. Stewart County Tennessee*, 958 F.2d 709 (6th Cir. 1992)(permissible for expert in correctional institutions to testify about the governing professional standards for jailers to follow in cases of attempted suicide and that the conduct of the defendants reflected "deliberate indifference"); *Kopf v. Skyrm*, 993 F.2d 374, 379 (4th Cir. 1993)(expert should be allowed to testify as to "prevailing standard of conduct for use of slapjacks"); *United States v. Schatzle*, 901 F.2d 252, (continued...)

The more difficult question is whether the defense experts in this case ought to be allowed to testify that a defendant acted "reasonably" and "appropriately." In varying contexts, a number of courts have been unwilling to allow such testimony on the theory that the opinion constitutes an impermissible legal conclusion.[17] Cases like the instant one, at first blush, seem difficult, because the relevant professional standards are drawn in part from the applicable law and the terms in which they are expressed. The applicable standard here is that of a *reasonable* officer acting in response to the situation confronting him, rather than with the 20/20 vision of hindsight. *Graham v. Connor*, 490 U.S. 386, 396-97(1989). Officers are trained in the constitutional limitations on the use of force, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989), and, within a margin allowing for reasonable mistakes, they must be able

---

[16](...continued)

256 (2nd Cir. 1990)(in excess force case, expert allowed to testify as to training Secret Service Agents receive in dealing with assailants); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236,239-240 (5th Cir. 1983)(conformity to standard of care "is a factual question" "not a legal conclusion,"and expert can say whether what was done conformed with industry standards and was "safe"); *Wade v. Haynes*, 663 F.2d 778 (8th Cir. 1981), *aff'd. on other grounds*, 461 U.S. 30 (1983)(expert in corrections administration permitted to say whether failure to review the background of prisoners in making cell assignments amounted to a breach affecting their personal safety). *Cf., Carmel v. Clapp & Eisenberg, PC*, 960 F.2d 698, 702 (7th Cir. 1992)(Sidley & Austin partner allowed to testify that a lawyer did a very thorough and careful job complying with the securities laws).

[17] *See, e.g., Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995)(improper to admit testimony of expert who opined on the reasonableness of officers' conduct under Fourth Amendment standards); *Aguilar v. Int'l Longshoreman's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992)(reasonableness and foreseeability of plaintiff's reliance inappropriate subjects for expert testimony). *Hygh*, 961 F.2d at 364 (disallowing expert's conclusions that an officer's conduct was not "justified or warranted under the circumstances" and was "totally improper"); *Strong v. E. I.Dupont de Nemours Co.*, 667 F2d. 682, 686 (2d Cir. 1981)(Question whether product was "unreasonably dangerous" for jury not expert); *Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985)(same); *Hutchison v. Cutliffe*, 344 F.Supp.2d 219, 222 (D.Me. 2004)(witness should not be allowed to opine about the reasonableness of the degree of force applied because once a jury decides which set of facts it believes, it will be within their ability to decide whether the use of force was reasonable or not); *Giles v. Rhodes*, 2000 WL 1425046 at *18 (witness may not testify as to the reasonableness or propriety of the defendants' actions); *Watkins v. New Castle County*, 374 F.Supp.2d 379, 393 (D.Del. 2005)(expert not allowed to testify that the conduct of the officers was unreasonable, reckless, willful, and violated the plaintiff's constitutional rights).

to apply established constitutional guidelines to their use of force in a given situation. *Saucier v. Katz*, 533 U.S. 194, 205 (2001). Even the training materials are couched in essentially legal terms,[18] and the problem is compounded by the jury instructions, which require that the plaintiff prove that the defendant used "unreasonable force" against the plaintiff and that as a result of the defendants' "unreasonable force," the plaintiff was injured. *See* Seventh Circuit Pattern Instruction 7.08, Fourth Amendment/Fourteenth Amendment: Excessive Force Against Arrestee Or Pretrial Detainee-Elements.

How then can an expert be expected to testify about these professional standards and discuss whether there has been adherence to or deviations from those standards without employing the very constitutional or statutory language to which Ms. Richman objects? The Fourth Circuit has suggested that "[t]he best way to determine whether opinion testimony contains legal conclusions is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002). "To

---

[18] Even a cursory review of the materials employed in use-of-force training demonstrates that they use legal terminology and concepts. For example, the International Police Chiefs' policy on the use of force states that "officers shall use only that level of force on the force continuum that is reasonably necessary. . . ." (*Motion to Strike*, Ex. 3, Model Policy, at B(1)). The Illinois Law Enforcement and Training Standards Board"s Guidelines for the Use of Force were designed to establish standards for the use of force that are "reasonable, necessary and within . . . legal expectations." (*Id.*, Ex. 3, Guidelines, at 1). The Guideline cite the Supreme Court's ruling on proper training – *City of Canton v. Harris*, 489 U.S. 378 (1989) – and specifically states that defining parameters for the "appropriate[] . . . use of force . . . training . . . necessitates a careful examination of state and federal legal requirements." (*Id.*, Ex. 3, Guidelines, at 2). Those requirements, according to the Guidelines, are the Fourth Amendment of the United States, Article 1, Section 6 of the Illinois Constitution, and 720 ILCS 5/7-5, which cover justifiable use of force. The Training Board's training curriculum was "developed based upon the legal propriety of peace officers[sic] use of force . . . ." (*Id.*, Ex. 3, Guidelines, at 3). But, the Training Board also cautions that "[a] simple mechanical application of these guidelines in assessing any training program would be futile if it is divorced from the federal and state legal imperatives upon which they are based. . . . Any approved program must address these important legal considerations which provide a context for the application of the guidelines." The professional standards and the legal standards for the use of force are clearly intertwined. (*Id.*, Exs. 2-4).

28

determine when a question posed to an expert witness calls for an improper legal conclusion, the district court should consider first whether the question tracks the language of the legal principle at issue or of the applicable statute, and second, whether any terms employed have specialized legal meaning." *Id. See also, United States v. Parris*, 243 F.3d at 289.

Where the testimony contains terms that have a separate, distinct, and specialized meaning in the law different from that present in the vernacular, the testimony may be deemed to constitute a legal conclusion and exclusion would not be inappropriate. However, where, as here, the word also has an everyday meaning, the testimony should not be excluded as constituting a legal conclusion. *See* 29 Wright and Gold, §6284 at 383-384. Even if the everyday understanding of a term and its legal meaning are congruent, exclusion is inappropriate where the opinion will not consist of a naked conclusion (i.e., the defendant's conduct was reasonable, was negligent, etc.) but will be based on "adequately explored legal criteria." That is, they will explain the reasons underlying the ultimate conclusion. Moreover, the court will instruct the jury on the appropriate meaning of the legal standard and that the jury is free to reject the testimony of the expert. Consequently, the risk of jury confusion is not present.

Under similar circumstances, courts have allowed the kind of testimony to which Ms. Richman objects. In *Parker v. Williams*, 855 F.2d 763 (11th Cir. 1988), an expert in the field of correctional facilities testified that the defendant was "grossly negligent" in hiring a jailer who raped a prisoner. Although the Court of Appeals thought it was a close question, it sustained the admission of the testimony, because the trial court had extensively instructed the jury on the proper weight to be given to the testimony and on the legal meaning of gross negligence, thereby negating the argument that the opinion was phrased in terms of inadequately explored legal criteria. Finally, the court noted that the term "gross negligence" is not

29

exclusively a legal conclusion, but rather encompasses a finding of ultimate fact. *Id.* at 777. *See also Heflin v. Stewart County, Tennessee*, 958 F.2d at 715 (permissible for expert in the field of correctional institutions to testify that sheriff's deputies were recklessly indifferent to the decedent prisoner's serious medical needs since the phrase was used in the way an ordinary layman would describe such conduct, not as a legal conclusion); *Karns v. Emerson Electric Co.*, 817 F.2d 1452 (10th Cir. 1987)(expert allowed to testify in a products liability suit that the device was unreasonably dangerous beyond the expectation of the average user and that the defendant acted recklessly in producing and distributing it). *Cf. United States v. Hurn*, 368 F.3d 1359, 1365 (11th Cir. 2004)(expert can testify that the defendant's belief in the legality of his acts was reasonable).

Judge Kennelly's decision in *Dowe v. National Railroad Passenger Corp.*, 2004 WL 887410 (N.D.Ill. 2004) is especially instructive. There, the defendants moved to bar the plaintiff's expert from testifying regarding the "reasonableness" or "prudence" of the conduct of Amtrak's engineer. Acknowledging the general principle that experts cannot testify about legal issues, Judge Kennelly concluded that Rule 704(a) permitted the expert testimony. He reasoned that although an unsupported conclusion that particular conduct is reasonable might not be particularly helpful to the jury – and thus inadmissible under Rule 702 – the expert reports made clear that plaintiff's counsel did not intend to illicit "bare conclusions" without explanation.[19] With explanation, Judge Kennelly held that the testimony regarding the reasonableness or unreasonableness of particular conduct will assist the jury.

Any potential prejudice, he concluded, would be eliminated by instructions to the jury that it is not

---

[19] "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157.

required to accept an opinion witness's conclusion. *See Storts v. Hardees Food System, Inc.*, 210 F.3d 390 (10th Cir. 2000)(unpublished opinion)(opinions on reasonableness and foreseeability properly admitted where, *inter alia*, jury carefully instructed). *See also Life & Health Insurance Co. of America v. Federal Insurance Co.*, 1995 WL 263551 (E.D.Pa. 1995)(denying motion to bar testimony of an expert who would testify on the reasonableness of the defendant's declination of coverage); *Martin v. Indiana Michigan Power Co.*, 292 F.Supp.2d 947 (W.D.Mich. 2002)(Plaintiff's argument that expert's opinions "on the reasonableness of [defendant's] conduct are inadmissible because they are legal in nature are unfounded."). *Cf. Mineral Investors Ltd. v. Lamb*, 9 F.3d 108 (6th Cir. 1993)(unpublished opinion)(real estate expert allowed to testify that reliance on an appraisal was not justified and thus could have assisted the jury on what was reasonable).

These cases are consistent with *Daubert*'s recognition that cross-examination and "careful jury instructions," not exclusion of expert testimony, are the preferred methods of dealing with challenged expert testimony. They are also consistent with the liberal thrust of Rules 702 and 704 and with the Advisory Committee's recognition that when an expert states an opinion on an ultimate issue with *adequate* exploration of the criteria upon which the opinion is based, the jury *is* provided with independent means by which it can reach its own conclusion or give proper weight to the expert testimony. [20]

---

[20] The lingering fear that merely because an expert gives an opinion that even touches on an ultimate legal issue the jury may be overawed by the expert is at odds with the liberalizing thrust of Rules 702-704 and the deeply felt conviction that juries are assumed capable of deciding the most complicated of cases, *In re U.S. Financial Securities*, 609 F.2d 411 (9th Cir. 1979); *Dunning v. Henry Flack International*, 2000 WL 1046712 at *3 (W.D.Va. 2003); *In re Sahlen & Associates*, 773 F.Supp. 342, 372 (S.D.Fla. 1991), of making effective use of any number of abstract legal propositions couched in unfamiliar terms, *United States v. Cohen*, 145 F.2d 82 (2nd Cir. 1944)(L.Hand, J.), and of being able to (continued...)

## c.
## The Plaintiff's Specific Objections

According to plaintiff, Mr. Bowman's opinions consist of three legal conclusions:

- the defendants "used only that force that was reasonably necessary";

- the defendants "acted in a manner reflecting proper training and supervision" ;

- the defendants "were carrying out there [sic] lawful duties."

For the reasons previously discussed, Mr. Bowman's first two opinions are admissible. He is certainly competent to testify that the behavior of the defendants reflected proper training and supervision, and his opinion on this ultimate issue is precisely the kind that Rule 704 allows. The opinion that the defendants used reasonable force is not, under the circumstances of this case, an impermissible legal conclusion. As in *Dowe v. National Railroad Passenger Corp.* (and the other cases discussed above), Mr. Bowman will be explaining the basis for his conclusion, and Judge Gottschall will carefully instruct the jury on the meaning of reasonable force and what factors the jury may consider in making its ultimate determination.[21] Similarly, instructions, long used in the federal courts, will tell the jury that they alone determine the weight to be given the experts' opinions, and that they alone determine the credibility of the witnesses on whose version of events the opinions are based. Finally, in light of the instructions that will be given and the fact that the concept of reasonableness is not so complex or shaded with subtle meaning

[20](...continued)

follow limiting instructions that often require an extraordinary degree of mental acuity. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *United States v. Dumeisi*, 424 F.3d 566, 579 (7th Cir. 2005).

[21] The Committee Comments to Seventh Circuit Instruction 7.09 Fourth Amendment/Fourteenth Amendment: Excessive Force - Definition of "Unreasonable" list a number of illustrative factors that the court may conclude should be presented to the jury for their consideration on the question of reasonableness.

32

as to be beyond the understanding of the average juror, the problem of "inadequately explored legal criteria" that troubled the drafters of Rule 704 will not be present.

Mr. Bowman should not be allowed to testify that the deputy sheriffs "were carrying out there [sic] lawful duties." That conclusion does not put the facts in context or assist the jury in understanding the facts at issue. It is impossible to tell whether Mr. Bowman means that the deputies were required "lawfully" to seek to subdue Mr. Richman, or, that all that they did was "lawful." Either way, it is a pure legal (and uninformative) conclusion, which merely is a shorthand way of saying that the defendants are not liable. The defendants will not be disadvantaged by exclusion of these ultimate legal conclusions, because the experts (or one of them) will be allowed to testify about applicable procedures and the deputies' compliance with them. If the jury concludes that the defendants complied with applicable standards and rules, a permissible if not inevitable conclusion will be that they acted properly (i.e., lawfully). *Cf.*, *Acrement v. Southern Pac. Transp. Co.*, 517 F2d. 729, 732 (5th Cir. 1975)(absence of a conclusory statement not prejudicial where the underlying testimony on which the conclusion was based was before the jury).

Finally, Ms. Richman contends that Mr. Bowman's opinion about the completeness of the investigation conducted by the Internal Affairs division should be excluded as irrelevant. (Motion to Strike, at 12-13). The question of relevancy under Rule 401 is a matter that can only be properly assessed by Judge Gottschall as the evidence unfolds during trial. There is a real case as well as a theoretical one, and what appears irrelevant in the abstract may become significant in light of the plaintiff's presentation at trial. It should be noted, however, that the definition of relevancy adopted in Rule 401 is expansive, and the relevancy requirement is a "minimal" one. *United States v. Murzyn*, 631 F.2d 525, 529 (7th Cir. 1980).

33

To be relevant under Rule 401, the evidence need not conclusively prove a fact in issue, but only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Thus, the question is not whether there is great probative weight, but whether there is any. *New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985); *United States v. Marks*, 816 F.2d 1207, 1211 (7th Cir. 1987).

We come then to Mr. Johnson, who draws plaintiff's criticism for concluding that the defendants' use of force:

- was "reasonable and in accordance with accepted practices and standards within the field of law enforcement," "within the elements established by Illinois Statute,"

- was "within guidelines established by the Cook County Sheriffs Office Policy and training which mirror Illinois law," and

- "was lawful and appropriate under the circumstances;"

- that the defendants had the "legal authority and legal duty and obligation to take Jack Richman into custody;" and that

- "the supervision provided to the deputies was appropriate."

With the exception of the opinion that the defendants acted lawfully or were required by law to take particular action, these opinions should be admitted. Lawfulness is not a self-defining standard and is a perfect example of an opinion that rests on unexplored legal criteria. Beyond the fact that Mr. Johnson is not competent to opine whether the defendants acted "lawfully," the conclusion that they did so is a pure legal conclusion that will not assist the jury, who may conclude that there is some significant difference between reasonable and lawful conduct.

The conclusion that supervision was "appropriate" is not a conclusion of law and is permissible

34

under Rule 704. *See Meneely v. Denman Tire Corp.*, 1995 WL 902213 (N.D.Fla. 1995)(that driver's actions were appropriate and reasonable was a proper opinion under Rule 704).

The opinions that the defendants' conduct was within the appropriate Illinois statute and that the guidelines mirror Illinois law present a closer question. In terms, they certainly appear to be legal conclusions and moreover, require an expertise that Mr. Johnson does not have. It will be for Judge Gottschall to determine and to instruct the jury on the provisions of Illinois law. However, an expert may identify the standard of care upon which their opinions are based subject to the court's control if they are stated erroneously or inadequately. *Dowe v. National Railroad Passenger Corp.*, 2004 WL 887410 at *1. This principle is broad enough to allow Mr. Johnson to explain to the jury that the professional standards conform to relevant law, so long as the court concludes that there is indeed a match.

Finally, the plaintiff takes Mr. Marsh to task for opining that:

- "the defendants' use of force was in compliance with the standard guideline for law enforcement,"

- "that the defendants followed departmental guidelines [and] nationally accepted use of force standards," and

- "that the defendants used appropriate force, followed departmental guidelines, training, policies, [and] nationally established standards . . . ."

Mr. Marsh's opinions should be admitted under Rules 702 and 704, except that he should not be allowed to expatiate on *Graham v. Connor*. Although not singled out by the plaintiff, these passages in Mr. Marsh's report, while brief, (*Motion to Strike*, Ex. 4, at 4, 5), verge on an explanation of the applicable law. Reference to the case is unnecessary to Mr. Marsh's discussion of the applicable standards to which law enforcement officers must adhere. It is for the court, not the expert, to instruct the

35

jury on the legal principles enunciated by *Graham*.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion to strike and exclude defendants' expert witnesses

[# 90] is GRANTED in part and DENIED in part.

**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 2/23/06

36